UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Zebadiah Hart, 02A4836,

                                        Plaintiff,                    **Hon. Hugh B. Scott**


                                                                      08CV681

                              v.                                      **Order**



Glenn S. Goord et al.,

                                        Defendant.

_____


        Before the Court is the defendants motion for partial summary judgment (Docket No. 27).


                              **Background**

        The plaintiff commenced this action pursuant to 42 U.S.C. §1983 alleging that defendants

Martin Ebert ("Ebert"), Jason Ziolkowski ("Ziolkowski"), Dean Acquard ("Acquard"), Patrick

Sippel ("Sippel"), S. Warner ("Warner"), Thomas Gebler ("Gelber"), J. Meegan ("Meegan"),

C.O. Hamilton ("Hamilton") and C.O. Considen ("Considen") used excessive force against him;

that defendants Glenn Goord ("Goord"), James Conway ("Conway") and Kenneth Barbery

("Barbery") failed to properly supervise their subordinates; and that defendants Jennifer Boyce

("Boyce"), Melissa Colby ("Colby"), David Nicosia ("Nicosia") and Stephen Laskowski

("Laskowski") were deliberately indifferent to his medical needs. At the time of the incident, the

plaintiff was incarcerated at the Attica Correctional Facility ("Attica").

More specifically, the plaintiff asserts that on September 10, 2005, another inmate asked Hart to ask Gelber to "crack" (open) cell A-8-19 because id did not open. Gelber is purported to have responded to Hart: "Shut the fuck up asshole, as a matter of fact, lock the fuck in Hart, your (sic) not going to yard." (Docket No. 1 at ¶ 24). According to the plaintiff, after further heated discussion with Gelber, he was locked in his cell. Hart alleges that later that day, Gelber threatened to "send [him] to the hospital" and used racially animated language toward Hart. (Docket No. 1 at ¶ 24). Hart asserts that he wrote a grievance on September 10, 2005, but never received any reply. He claims that he wrote an additional grievance on September 25, 2005 to inquire as to the status of the September 10, 2005 grievance. Hart contends that he also wrote to the Correctional Association of New York and to a private attorney. (Docket No. 1 at ¶24).

On September 14, 2005, according to Hart, he told Barbery that Gelber was threatening him and asked to be moved to a different cell block. (Docket No. 1 at ¶ 25). On September 16, 2005, the plaintiff claims that as he was walking through the A-block lobby, Gelber pointed to him. At that time, Hart alleges that: Acquard told the plaintiff to step out and put his hands on the wall for a random pat frisk; Ziolkowski locked the lobby gate to the yard hallway; Sippel proceeded to frisk Hart and directed Hart to take off a boot. The plaintiff contends that Gelber then pulled something from his own pocket and yelled: "What the fuck is this Hart." (Docket No. 1 at 26). The plaintiff claims that he replied: "That's not mine." Whereupon, Hart asserts that Sippel, Ebert, Ziolkowski, Acquard, Warner, Gelber, Meegan, Hamilton and Considen assaulted him. (Docket No. 1 at ¶ 26). Hart alleges that he was stabbed in the right leg and beaten with a baton. (Docket No. 1 at ¶ 26). The plaintiff contends that Ebert yelled out "stop resisting" as he

hit the plaintiff with his baton. (Docket No. 1 at ¶ 27). After the alleged beating, Hart claims that he was escorted to the hospital, "cleaned up," photographs were taken, and he was then locked in a cell in the Special Housing Unit ("SHU"). (Docket No. 1 at ¶ 27).

Hart claims that on September 17, 2005, he advised Nicosia, one of the nurses at Attica, that his "right lower *left* leg" was "numb and swollen" and that nurse Nicosia stated he would "talk to the doctor about it." (Docket No. 1 at ¶ 28). On September 18, 2005, the plaintiff states that he was seen by Dr. Laskowski, at which time Hart told Dr. Laskowski of the numbness in his "*right* lower leg."[1] (Docket No. 1 at ¶ 28(A)). On September 19, 2005, the plaintiff states that he saw nurse Nicosia and asked for an x-ray for his "lower right leg and foot."Hart claims that nurse Nicosia returned and told Hart that Dr. Laskowski would not order an x-ray because his leg did not look broken. (Docket No. 1 at ¶ 28(B)). Hart alleges that on September 19, 2005 he also saw Captain D'Angelo, Lieutenant Bea, and Sergeant O'Connell and advised them that he was not receiving adequate medical care.[2] (Docket No. 1 at ¶ 28(C)). Similarly, Hart asserts that on September 20, 2005 he saw O'Connell and Deputy Superintendent of Security R. James, and asked why he was moved from BW-18 cell to CW-15 cell; to which James allegedly responded: "Because I own you boy. I move you where I want to move you."[3] (Docket No. 1 at ¶ 28(D)). Hart states that he spoke to an unnamed nurse on September 21, 2005 who told him that his leg does not look as if it needs an x-ray. (Docket No. 1 at ¶ 28(E)). On September 22, 2005, Hart

---

[1] All further references in the record appear to state that the wound was on his lower right leg. It would appear that the plaintiff's reference to his left leg in the complaint was an error.

[2] These individuals do not appear to be defendants in this action.

[3] James is also not a defendant in this action.

was seen by Joyce, another nurse at Attica, and asked to receive something for the pain in his lower right leg. (Docket No. 1 at ¶ 28(G)). The plaintiff asserts that he was seen by Dr. Laskowski again on September 24, 2005, and again asked about his lower right leg, but that Dr. Laskowski allegedly walked away while Hart was talking to him. (Docket No. 1 at ¶ 28(H)).

On September 27, 2005, an x-ray was performed on Hart's lower right leg which revealed that there was *no fracture* to his leg or toes. (Docket No. 1 at ¶ 28(I)). The plaintiff claims, however, that the x-ray revealed that his nerves and scar tissue were badly damaged, and that he had a bloodclot due to an infected puncture wound. (Docket No. 1 at ¶ 28(I)).

Hart asserts that on October 11, 2005, Colby, another nurse at the facility, yelled "sick call" in front of the gallery but did not walk the gallery. The plaintiff claims that he called for nurse Colby to tell her about puss coming from his leg wound, but she did not walk down the gallery. (Docket No. 1 at 28 (J)). On October 12, 2005, Hart alleges that he told nurse Nicosia about the puss from his wound, but that Nicosia told him to wait for tomorrow. (Docket No. 1 at ¶ 28(K)). On October 13, 2005, nurse Nicosia gave the plaintiff band-aids and an antibiotic ointment, but Hart did not think it was appropriate because the directions for the ointment said not to put it on an open wound. Nurse Nicosia allegedly told Hart: "well, that's all I got." (Docket No. 1 at ¶ 28(L)). Hart allegedly repeated the complaint to nurse Colby on October 14, 2005, to which she allegedly responded "that's all your getting" (Docket No. 1 at ¶ 28(N)). The plaintiff states that he was seen Dr. Laskowski on October 15, 2005, and the Dr. Laskowski stated that Hart's leg wound should be properly cleaned and that he ordered adhesive pad's and iodine pads to treat the wound. Notwithstanding, Hart claims that when nurse Colby came by later that day, all she gave Hart were band-aids and antibiotic ointment. (Docket No. 1 at ¶

28(N)). On October 17, 2005, Hart states that he asked for emergency sick call because he was unable to move his right foot and noticed an odor coming from his wound. Hart alleges that Corrections Officer Phillip came back to his cell and told Hart that nurse Nicosia had said that it would be okay and could wait until tomorrow. (Docket No. 1 at ¶ 28(P)).

On October 19, 2005, the plaintiff asserts that he stopped Deputy Superintendent of Programs Sandra Dolce, Deputy of Administration Weller, Captain Stight and Lieutenant Bea as they were making rounds and told them about his leg. (Docket No. 1 at ¶ 28(Q)). On October 21, 2005, he received Ibuprofen for pain. (Docket No. 1 at ¶ 28(R)). The plaintiff claims that Dr. Laskowski ignored him on October 23, 2005 and October 30, 2005. (Docket No. 1 at ¶ 28(S) and (T). Hart contends that on November 5, 2005 he asked Dr. Laskowski about "the middle finger of his left hand" and Dr. Laskowski told him that he would refer the plaintiff to a hand specialist (Docket No. 1 at ¶ 28(U)), but that Dr. Laskowski did not refer Hart to a hand specialist. (Docket No. 1 at ¶ 28(V) and (W)). Hart stated that on October 19, 2005 he received amoxicillin (Docket No. 1 at ¶ 28(X)) and on October 27, 2005 he received cephalexin (Docket No. 1 at ¶ 28(Y) to treat his leg wound.

The defendants assert that on September 16, 2005, a weapon[4] was found in Hart's boot during a random pat frisk. Hart attempted to grab the weapon but merely slapped it from Gebler's hand. (Docket No. 17-4 at page 33). The defendants state that Hart was able to get control of Gebler's baton and used it to hit Ziolkowski in the head. According to the use of force report, at that point, Ebert and Ziolkowski used baton strikes to get Hart to release the baton. (Docket No.

---

[4] The weapon is alleged to have been a box cutter razor wrapped in a cardboard sheath. (Docket No. 17-4 at page 33).

17-4 at page 7). Gebler filed a misbehavior report charging Hart with assault on staff, violent conduct, disobeying a direct order and possession of a weapon. (Docket No. 17-4 at page 24-25). After a Tier III administrative hearing on October 23, 2005, Hart was found guilty of all charges and sentenced to 36 months in SHU, as well as loss of phone, commissary and packages privileges. (Docket No. 17-4 at page 26). Hart was seen by nurse B. Schultz ("Shultz") after the incident. Medical records reflect that the plaintiff suffered a small adhesion and pain in right lower leg, an adhesion on the second toe of this right foot, left shoulder pain, slight swelling of left eyebrow and left cheek bone.[5] The adhesions were cleaned with benedictine and bandages were applied. He was given Ibuprofen for pain. (Docket No. 17-4 at page 11). Nurse Shultz saw Hart a second time later that same day. At that time, she noted that Hart had no new injuries, that he was not on any medications and that there would be a medical follow up the next morning. (Docket No. 30, Exhibit B, Bates No. 611). The medical records reflect that the next day, September 17, 2005, Hart was seen by nurse Nicosia, who noted that Hart complained of swelling in his right leg and foot. nurse Nicosia advised Hart to elevate his leg and to speak to the doctor when he came by on rounds. (Docket No. 30, Exhibit B, Bates No. 611). The records reflect that Dr. Laskowski saw Hart on September 17, 2005 as well. At that time, Dr. Laskowski noted that Hart's right leg was not swollen and no open wound was noted. (Docket No. 30, Exhibit B, Bates No. 611). Hart was seen again on September 18, 2005 by nurse Nicosia, who

_____

[5] In addition to the injuries alleged to the plaintiff, the records generated after the incident reflect that: Gebler suffered a scratch to the inside of his left elbow, his right knee was reddened, swollen and painful; Sippel suffered a twisted right knee and right ankle, which were both reddened, as well as tenderness and slight swelling; Ziolkowski suffered abrasions to the back of the neck, the top of his head was throbbing with slight redness and swelling noted, and he complained of a headache. (Docket No. 30, Exhibit D, Bates No. 266).

noted that Hart was sent for a tuberculosis test. Nurse Nicosia noted that he observed that the plaintiff had a slight limp. (Docket No. 30, Exhibit B, Bates No. 612). On September 21, 2005, Hart was seen by Physician's Assistant Robert McGee. The plaintiff complained of pain in his right foot. No swelling, bony deformities, open sores, abrasions were seen. Hart was able to place his full weight on this foot and ankle. McGee ordered Motrin (400 mg) to be continued three times a day as needed. (Docket No. 30, Exhibit B, Bates No. 612). On September 22, 2005, medical records reflect that Hart was seen by Physician's Assistant ("P.A.") Edwards. Although Hart again complained of swelling in his leg and foot, P.A. Edwards noted no swelling but did note that Hart was not placing weight on his foot and that Hart had requested an x-ray. P.A. Edwards ordered an x-ray to be performed. (Docket No. 30, Exhibit B, Bates No. 612). On September 27, 2005, an x-ray was taken of Hart's leg, foot and ankle revealing no abnormalities. (Docket No. 30, Exhibit B, Bates No. 617). P.A. Edwards saw Hart again on September 27, 2005, and noted some swelling of the plaintiff's right leg. P.A. Edwards assessed that Hart had a contusion on his leg, but noted that the x-ray of Hart's leg was negative.[6] On October 3, 2005, the plaintiff was again seen by nurse Nicosia regarding the need for an inhaler for his asthma. (Docket No. 30, Exhibit B, Bates No. 613). On October 5, 2005, Hart was seen by P.A. McGee regarding the need for an inhaler.[6]

_____

[6] That Hart had a contusion on his right leg is not surprising inasmuch as the Unusual Incident Report generated as a result of the September 16, 2005 incident reflects that Ziolkowski "applied five baton strikes to [Hart's] lower R/leg" in an effort to recover the baton hart allegedly grabbed from Gebler. (Docket No. 17-4 at page 73).

[6] Hart's claims in the instant case do not concern the treatment of his asthma. P.A. McGee noted that the plaintiff had no acute disease, and that Hart had last used of inhaler in October of 2004. The medical records reflect that Hart denied that his asthma was acting up at that moment, but that he wanted the inhaler "just in case".(Docket No. 30, Exhibit B, Bates

Hart was seen again by nurse Nicosia on October 13, 2005. At that time, Hart complained of an oozing sore on his tibia. Nurse Nicosia noted an open area on the front of his right leg, provided Hart with triple antibiotic ointment. Nurse Nicosia advised Hart to keep the area clean and dry, to apply the triple antibiotic ointment and leave it open to air (Docket No. 30, Exhibit B, Bates No. 614). The medical records reflect that on October 17, 2005, Hart was seen by nurse Sheryl Stewart. On that occasion, nurse Stewart indicated that she had seen the plaintiff three to five times in the afternoon, between October 10 and 12, 2005. Nurse Stewart noted that the plaintiff presented with some oozing, and had a sore that was approximately one inch in diameter and one half inch in depth. She noted swelling on the leg and indicated that Hart had been supplied with three inch by five inch Telfa Bandages in the afternoon to control oozing, and that she advised the plaintiff to keep the leg clean and dry, and open to air. Nurse Stewart noted that the plaintiff had been "packing" the sore with dressing, and that this was not appropriate for such a sore. According to nurse Stewart, the plaintiff agreed to remove the bandage in the morning for sick call, and stated that he wished to follow-up with P.A. Edwards. Nurse Stewart indicated that she would place a copy of the notes in P.A. Edwards' mail box for his review (Docket No. 30, Exhibit B, Bates No. 614). On October 21, 2005, nurse Colby made a "late entry" in the plaintiff's chart indicating that on October 14, 2005, she spoke with the plaintiff regarding his lower right leg wound, while she was doing sick call. She noted that he had no signs or symptoms of infection, that the surrounding skin was intact, and she saw no drainage. She instructed the plaintiff to wash the area with soap and water twice a day, apply the triple antibiotic twice a day, and follow-up with sick call as needed (Docket No. 30, Exhibit B, Bates

No. 613).

No. 615). The records reflect that Hart was seen by P. A. McGee on October 19, 2005. The plaintiff complained of the open sore on his right leg. P.A. McGee noted draining from the sore, but saw no current signs of infection. P.A. McGee prescribed Amoxicillin 500 mgm (twice a day for seven days) – which McGee's notes indicated to be a prophylaxis plan, and advised the plaintiff to continue dressing the sore (Docket No. 30, Exhibit B, Bates No. 615). On October 21, 2005, Hart was seen by nurse Boyce. She gave him Motrin, to be taken four times a day for ninety days. She encouraged him to continue to wash his right leg with soap and water. She indicated that she would deliver Telfa dressings to his cell for self dressing change. (Docket No. 30, Exhibit B, Bates No. 615).

Documents show that Superintendent Conway reviewed the Unusual Incident Report of the September 16, 2005 incident on September 27, 2005 and determined that the staff use of force was necessary but directed an investigation into how Hart gained possession of the baton. (Docket No. 30, Exhibit D, Bates No. 270). On September 27, 2005, Conway also received a letter from Attorney Jonathan Svetkey inquiring as to whether Hart was receiving adequate medical care for his injuries. (Docket No. 30, Exhibit E, Bates No. 146). Conway referred the letter to nurse Barbara Frisby. (Docket No. 30, Exhibit E, Bates No. 145), who informed Conway of the medical treatment and x-rays provided to Hart as a result of the incident. (Docket No. 30, Exhibit E, Bates No. 144). Conway received a second letter from another attorney, Peter Henner, on October 26, 2005. By letter dated November 3, 2005, Conway responded to Henner, advising him that the concerns raised in Henner's letter had been investigated and addressed, that Hart was receiving adequate medical care, and that the allegations of misconduct by the corrections staff were investigated and determined to be unfounded. (Docket No. 30, Exhibit E, Bates No.

140).

Defendants Barbery, Boyce, Colby, Conway, Goord, Laskowski and Nicosia have filed a motion for summary judgment.

## Discussion

**Motion for Summary Judgment**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. See Trans Port, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party. See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit Information, Co., 970 F.2d 1110, 1112 (2d Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The non-moving party must come forward with enough evidence to support a jury verdict . . . and the . . .

motion will not be defeated merely . . . on the basis of conjecture or surmise." <u>Trans Sport</u>, 964 F.2d at 188 (<u>citing</u> <u>Bryant v. Maffucci</u>, 923 F.2d at 982). If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the non-moving party." <u>Glazer v. Formica Corp.</u>, 964 F.2d 149, 154 (2d Cir. 1992) (<u>citing</u> <u>Dusanenko v. Maloney</u>, 726 F.2d 82 (2d Cir. 1984). The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them. <u>See</u> <u>Burger King Corp. v. Horn & Hardart Co.</u>, 893 F.2d 525, 528 (2d Cir. 1990). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.</u>, 235 F.3d 53 (2d Cir. 2000) (<u>quoting</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**Eighth Amendment Standard**

The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend. VIII. "This includes punishments that 'involve the unnecessary and wanton infliction of pain.' " <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir.1998) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976)). See also <u>Hernandez v. Keane</u>, 341 F.3d 137, 144 (2d. Cir. 2003). While "society does not expect that prisoners will have unqualified access to health care," <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with "deliberate indifference" to the inmate's serious medical needs. <u>Hathaway v. Coughlin</u>, ("Hathaway I"), 37 F.3d 63, 66 (2d Cir.1994) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

This standard incorporates both objective and subjective elements. The objective "medical need" element measures the severity of the alleged deprivation, while the subjective "deliberate indifference" element ensures that the defendant prison official acted with a sufficiently culpable state of mind. Smith v. Carpenter, 316 F.3d 178, 183 -184 (2d. Cir. 2003). To prevail on a constitutional claim of deliberate medical indifference, a plaintiff must prove that he suffered from an objectively serious medical condition, which the defendants knew of and deliberately disregarded. Green v. Senkowski, 2004 WL 1292786, *1 (2nd Cir. 2004) citing Chance, 143 F.3d at 702 (collecting cases). A serious medical condition is one that may result in death, degeneration, or "chronic and substantial pain." Id.; see Hathaway I, 37 F.3d at 66. This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain." Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Chance, 143 F.3d at 702. To satisfy the subjective prong of the test, prison officials must have acted with a sufficiently culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment. See Estelle, 429 U.S. at 104-05. See also Farmer v. Brennan, 511 U.S. 825, 837 (1994)("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "[T]he subjective element of deliberate indifference 'entails something more than

12

mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' Hathaway II, 99 F.3d at 553 (quoting Farmer, 511 U.S. at 835). Accordingly, subjective recklessness can satisfy the deliberate indifference standard only where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

Also, it is well-established that a prisoner is not entitled to receive the medical treatment of his choice. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment or a different doctor does not give rise to an Eighth Amendment violation. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986) (The essential test is one of medical necessity and not one simply of desirability). A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a §1983 claim. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998); Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.1981). The Constitution does not require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997), Davis v. Hall, 992 F.2d 151, 153 (8th Cir.1993).

Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. Chance v.Armstrong, 143 F.3d. 698 (2d. Cir. 1998); Johnson v. Snow, 2008 WL 2224949 (N.D.N.Y., 2008); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Sires

v. Berman, 834 F.2d 9, 13 (1st Cir.1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [a court] will not second guess the doctors." (citations omitted)).

Finally, a plaintiff asserting an Eighth Amendment claim based upon inadequate medical care must establish deliberate indifference for each individual defendant against whom the claim is asserted. Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)(stating that plaintiff must show deliberate indifference on the part of a "particular defendant").


**Hart's Medical Complaints**

The plaintiff's claims of deliberate indifference appear to revolve around his contention that the medical providers did not deal with the pain in his right leg, did not order an x-ray quickly enough; and that they did not properly treat the open wound on this lower right leg.

Hart has failed to establish a basis upon which it could be concluded that any of the defendant medical providers were deliberately indifferent to his medical needs. The undisputed medical records reflect that nurse Boyce only saw Hart on one occasion, October 19, 2005, at which time she provided hart with Motrin for pain. (Docket No. 30, Exhibit B, Bates No. 615). The x-ray of the plaintiff's leg had already been taken by that date, and amoxicillin had already been prescribed for the open wound. Similarly, the medical records reflect that nurse Colby also saw Hart on only one occasion, October 14, 2005. At that time, she noted no signs of infection regarding his leg wound and advised Hart to clean the area with soap twice a day and to use the triple antibiotic ointment he was provided. (Docket No. 30, Exhibit B, Bates No. 615). Hart contends that on one occasion he called out for nurse Colby, but that she did not stop by to see

him. This allegation, absent some indication that nurse Colby was aware of a substantial risk of serious harm to the plaintiff at that time, is insufficient to support a claim of deliberate indifference on the part of nurse Colby.  Further, without providing any specific detail, Hart asserts that nurse Colby was vulgar toward him and did not treat him with respect. (Docket No. 40-2 at page 43). Again, this is insufficient to sustain a claim of deliberate indifference.

The undisputed medical records reflect that hart was seen by medical personnel almost on a daily basis – more than 20 times – during the month following the September 16, 2005 incident. nurse Nicosia and Dr. Laskowski each saw the plaintiff on numerous occasions.  The plaintiff was provided with medication for the pain in his right leg on the day of the incident (Docket No. 17-4 at page 11) and thereafter for up to a 90-day period (Docket No. 30, Exhibit B, Bates No. 612, 615).  Although the plaintiff complains that the defendants delayed ordering an x-ray of his right leg, the plaintiff acknowledges that the medical providers did not believe an x-ray was necessary.  In any event, when an x-ray was taken, approximately 10 days after the incident, the test reflected a normal right leg and foot with no evidence of fracture or dislocation. (Docket No. 30, Exhibit B, Bates No. 617).  Thus, any delay in ordering the x-ray was immaterial. Finally, Hart complains about the treatment of the wound to his lower right leg.  While a question of fact may exist as to the genesis of the wound, the record reflects that the wound was adequately treated in a timely fashion with antibiotic ointment, bandages, and prescription amoxicillin. (Docket No. 30, Exhibit B, Bates Nos. 614, 615). Hart's first complaint regarding the open wound appears to have been noted on October 13, 2005 (Docket No. 30, Exhibit B, Bates No. 614). After initially treating the wound with triple antibiotic ointment, prescription amoxicillin was provided on October 16, 2005. (Docket No. 30, Exhibit B, Bates No. 615).  The

plaintiff admits that the treatment cleared up the infection. (Docket No. 30, Exhibit A, at page 95). The fact that the defendants attempted to use a topical antibiotic before prescribing amoxicillin is not evidence of deliberate indifference to a serious medical risk to the plaintiff. The plaintiff has failed to articulate any basis, as a matter of law, upon which a reasonable trier of fact could conclude that defendants Boyce, Colby, Nicosia or Laskowski were deliberately indifferent to a substantial risk of serious harm to the plaintiff which they disregarded by failing to take reasonable measures to abate it. See Chance, 143 F.3d. 698 (2d. Cir. 1998)(a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference).

The motion for summary judgment as to defendants Boyce, Colby, Nicosia and Laskowski should be granted.


**Claims Against Barbery, Conway and Goord**

Defendants Barbery, Conway and Goord move for summary judgment on the grounds that the plaintiff has not, and cannot, establish any personal involvement on their parts with respect to the claims in the complaint. Hart claims that Barbery, Conway and Goord violated his rights by failing to protect him from the alleged assault on September 16, 2005, and for failing to ensure that he received adequate medical treatment. (Docket No. 40 at pages 13-15).

As an initial matter, it is undisputed that the plaintiff does not set forth any allegations that Barbery, Conway or Goord were personally involved in the alleged assault on September 16,

2005.[7]  Indeed, other than naming him as a defendant, Hart's complaint asserts no allegations

regarding Barbery and is insufficient as to that defendant.[8]  The plaintiff asserts that Conway and

Goord, are responsible for "negligent and inadvertent failure to supervise" of their employees.

(Docket No. 1 at ¶¶36-50).  Hart has acknowledged that prior to the September 16, 2005 incident

Conway did not "know anything" about threats to Hart by any officers. (Docket No. 40-2 at

pages 44-45).  Hart does not allege that he had any direct conversations with Goord or that he

wrote to Goord regarding the alleged threat prior to the September 16, 2005 incident.

It is well-settled that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d

496, 501 (2d Cir.1994). Plaintiff must allege a "tangible connection between the acts of a

---

[7]  In light of the above finding that the plaintiff was afforded adequate medical treatment regarding any injuries sustained as a result of the September 16, 2005 incident, the Court need not further discuss Hart's claims that Barbery, Conway and Goord should be held liable for failing to ensure that he received adequate medical care.

[8]  During his deposition, Hart stated that on or about September 13 or 14, 2005 (prior to the September 16, 2005 incident),  he talked to Barbery and expressed general concerns that he might be jumped by Gebler and asked Barbery to have him moved to another cell block. (Docket No. 40-2 at pages 35-36). According to Hart, Barbery told Hart he would talk to the program committee supervisor. (Docket No. 40-2 at page 36). Hart testified that he was not seeking "wages or nothing from" Barbery. (Docket No. 40-2 at page 41). Hart stated that he did think Barbery should have "reported [Hart's concerns] to higher authorities." (Docket No. 40-2 at page 42). Hart does not allege that Barbery had the authority to transfer him to another cell block or that Barbery had any actual or constructive notice of the alleged plans by Gebler to attack Hart on September 16, 2005. Liability for a failure to protect cannot be imposed upon the defendants based upon the imputation of alleged knowledge or speculation. A defendant can only be held liable if he "has **actual** or constructive notice of a **specific risk** to an inmate's safety and fails to take steps to protect the inmate from injury. See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).  Hart has not presented evidence establishing a factual question as to whether Barbery was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, *and* that Barbery actually drew such an inference but disregarded it. Farmer v. Brennan, 511 U.S. 825, 837 (1994); Hines v. Lacy, 189 F.3d 460 (2d Cir.1999).

defendant and the injuries suffered." <u>Bass v. Jackson</u>, 790 F.2d 260, 263 (2d Cir.1986). The

doctrine of *respondeat superior* is not applicable to § 1983 actions brought against prison

officials. <u>Monell v. Dep't of Social Serv. of New York</u>, 436 U.S. 658, 692 (1978); <u>Bass</u>, 790

F.2d at 263. Thus, the mere fact that a defendant may have been in a "high position of authority is

an insufficient basis for the imposition of personal liability" under § 1983. <u>McKinnon v.

Patterson</u>, 568 F.2d 930, 934 (2d Cir.1977); *see also* <u>Wright</u>, 21 F.3d at 501. There are a number

of ways in which a defendant in a supervisory position may be found personally involved in, and

therefore liable for, constitutional violations, including: (1) direct participation, (2) failure to

remedy a wrong after learning of it, (3) creation or tolerance of a policy under which

unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in

managing subordinates who committed the violations. <u>Wright</u>, 21 F.3d at 501 (citations omitted);

<u>Doyle v. Coombe</u>, 976 F.Supp. 183, 191-192 (W.D.N.Y.1997), *aff'd* 159 F.3d 1346, 1998 WL

537066 (2d Cir.1998); <u>Shell v. Brzezniak,</u> 365 F.Supp.2d 362 (2005), 373 -374

(W.D.N.Y.,2005). The Supreme Court has held that a municipality will be liable for inadequate

training or supervision of its employees "only where the failure to train amounts to deliberate

indifference to the rights" of those with whom municipal employees will come into contact. <u>City

of Canton v. Harris</u>, 489 U.S. 378, 388 (1989). The Second Circuit set forth the following

three-part test for determining whether a municipality's failure to train or supervise rises to the

level of deliberate indifference: First, the plaintiff must show that a policymaker knows "to a

moral certainty" that her employees will confront a given situation.... Thus, a policymaker does

not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.

Second, the plaintiff must show that the situation either presents the employee with a difficult

choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... [Third,] the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Walker v. City of New York, 974 F.2d 293, 297 (2d Cir.1992) (citations omitted). However, to defeat a motion for summary judgment on a § 1983 claim, a plaintiff must do more than "simpl[y] recit[e] ... a failure to train municipal employees." Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993). A plaintiff must produce "some evidence that policymakers were aware of a pattern of [unconstitutional conduct] but failed to [respond]." Walker, 974 F.2d at 300.

Here, Hart fails to assert any specific acts or omissions by Conway or Goord; nor does he demonstrate the existence of any specific pattern or policy created by Conway[9] or Goord. In response to the instant motion, the plaintiff does submit documents from The Correctional Association of New York. (Docket No. 40-1 at pages 29-43). These documents appear to be hearsay and are not in admissible form. In deciding a motion for summary judgment, court may rely only on material that would be admissible at trial. Rubens v. Mason, 387 F.3d 183 (2d. Cir. 2004)(in deciding a motion for summary judgment, a court may rely only on material that would be admissible at trial); United Magazine Co., Inc. v. Curtis Circulation Co., 279 Fed.Appx. 14 (2d. Cir. 2008)(citing Fed.R.Civ.P. 56(e) prohibiting reliance on facts not admissible at trial). In any event, these documents refer *generally* to violence in prisons by corrections officers (as well

---

[9]   It appears that upon review of the penalties assessed against Hart after he had been found guilty of the misbehavior report issued following the September 16, 2005 incident, Conway *reduced* the number of months of SHU imposed upon the plaintiff. Hart claims that the reduction of the SHU sentence by Conway is evidence that Conway was a "conspirator" acting to cover up the wrong doings of his subordinates. (Docket No. 40 at page 17). Hart fails to articulate a logical nexus between the reduction of the SHU sentence and the acts attributed to the non-moving defendants.

as several other prison issues), but do not provide specific information regarding such violence, or the documentation or source of any information upon which such general conclusions are drawn. More significantly, the documents do not evidence the awareness of Barbery, Conway or Goord as to any pattern of unconstitutional conduct. As such, these documents would not assist a trier of fact to determine the existence of any specific pattern of unconstitutional conduct on the part of the defendants (or other correctional officers) in this case.

In the instant case, as noted above, the plaintiff has failed to establish any personal involvement on the part of defendants Barbery, Conway or Goord regarding the claims in this case. Based on the above, the motion for summary judgement should be granted as to defendants Barbery, Conway and Goord.

## Conclusion

Consistent with the above, it is recommended that the motion for summary judgment be granted as to defendants, Boyce, Colby, Laskowski, Nicosia, Barbery, Conway and Goord,

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION**

**WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.


/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
January 13, 2011